UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VLADIMIR JEANTY,

                                   Plaintiff,

                    -v.-

CITY OF NEW YORK, *et al.*,

                                   Defendants.

---

18 Civ. 5920 (KPF)

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Vladimir Jeanty — who initially brought this action *pro se*, but more recently has received the assistance of *pro bono* counsel[1] — seeks redress for the unconstitutional actions of one or more municipal employees.  After Defendants conceded partial liability, the Court held a one-day bench trial on July 27, 2020, to resolve the issue of damages.  This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52.

## PROCEDURAL HISTORY

On June 29, 2018, Plaintiff filed suit against the City of New York (the "City") and various employees of the New York City Taxi and Limousine Commission (the "TLC") (collectively, "Defendants"), alleging that the TLC had refused to process his timely-filed application for renewal of his For-Hire Vehicle ("FHV") license, and in so doing had violated the Due Process and

---

[1]     The Court takes this opportunity to extend its thanks to the team of attorneys from the Vinson & Elkins firm for their excellent work on this case.

Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution.

On June 3, 2019, the Court dismissed Plaintiff's First Amended Complaint, but granted Plaintiff leave to amend his equal protection claim.  *See Jeanty* v. *City of New York*, No. 18 Civ. 5920 (KPF), 2019 WL 2343008, at *11 (S.D.N.Y. June 3, 2019) ("*Jeanty I*").  Plaintiff filed his Second Amended Complaint on June 28, 2019.  (Dkt. #48).

On April 27, 2020, after months of negotiations and the introduction of new counsel, Plaintiff and Defendants jointly submitted a Stipulation as to Liability and Proposed Order in which the City admitted (i) liability as to Plaintiff's claim for violation of his constitutional rights under the Equal Protection Clause of the Fourteenth Amendment, and (ii) the City's municipal liability for violation of Plaintiff's constitutional rights under 42 U.S.C § 1983. (*See* Dkt. #79).  For his part, Plaintiff agreed to voluntarily dismiss with prejudice (i) all claims against the individual TLC Defendants, and (ii) his claims for negligence and negligent infliction of emotional distress against all Defendants.  (*See id.*).  On April 29, 2020, the Court entered an Order: (i) dismissing with prejudice all claims against the individual Defendants; (ii) dismissing with prejudice Plaintiff's claims for negligence and negligent infliction of emotional distress; and (iii) pronouncing Defendant City of New York (a) liable to Plaintiff for the violation of Plaintiff's constitutional rights under the Equal Protection Clause of the Fourteenth Amendment in an amount to be determined at trial and (b) liable as a municipality for violation of

Plaintiff's constitutional rights under 42 U.S.C § 1983 in an amount to be determined at trial.  (*See* Dkt. #80).[2]

On July 27, 2020, the Court held a bench trial to determine the amount of damages owed to Plaintiff, and now it renders its decision.  After considering the parties' pre- and post-trial submissions and the evidence developed at trial, the Court concludes that Plaintiff is entitled to compensatory damages for economic losses in the amount of $20,681.10, compensatory damages for emotional distress in the amount of $35,000.00, and prejudgment interest on his economic damages.

## FINDINGS OF FACT[3]

### A.    Plaintiff's Work History

From April 2014 through July 2017, Plaintiff primarily worked as a commercial truck driver for Allied Building Products, Inc. ("Allied").  (Tr. 48:10-22, 52:24-53:7).  Plaintiff generally worked sixty hours per week at Allied from April through the end of November each year.  (*Id.* at 48:13-25).  Plaintiff stopped working at Allied in July 2017 due to a medical condition.  (*Id.* at 32:1-5, 52:24-53:7).

---

[2]    One practical effect of the Court's Order was to render the City the only defendant at trial.  References in this Opinion to "Defendant" refer to the City alone.

[3]    The Court relied on several documents in drafting this Order, including the transcript of the trial ("Tr." (Dkt. #90)) and the exhibits that Plaintiff ("Pl. Ex.") and Defendant ("Def. Ex.") introduced during that trial; the Stipulation as to Liability ("Stipulation" (Dkt. 79-1)); Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. FFCL" (Dkt. #94)); and Defendant's Proposed Findings of Fact and Conclusions of Law ("Def. FFCL" (Dkt. #95)).

Plaintiff held an FHV license issued by the TLC from late August 2015 to late August 2016 and from April 2017 through the end of 2018.  (Tr. 20:25, 56:5-25).  To supplement his Allied wages, Plaintiff worked part time as an FHV driver from April 2016 to late August 2016 and from April through July 2017. (*Id.* at 31:9-13; 49:23-50:15, 52:17-53:7).  After leaving Allied, Plaintiff worked full time as an FHV driver from July 2017 through the end of 2018.  (*Id.* at 32:1-5, 53:2-10, 56:23-25).  Plaintiff ceased work as an FHV driver after 2018 due to injuries sustained in a vehicle accident.  (*Id.* at 19:4-15, 33:11-14, 56:23-25).

From December 2016 to April 2017, Plaintiff neither worked as a commercial driver for Allied nor drove an FHV, due to the expiration of his FHV license.  (Tr. 64:21-24).  Plaintiff did not seek alternate employment besides working for Allied and driving an FHV during this period.  (*Id.* at 63:10-12).

**B.    Defendants' Denial of Plaintiff's FHV License Renewal Application**

This litigation stems from Plaintiff's efforts to renew his FHV license.  The license was due to expire on August 25, 2016.  (Pl. Ex. 1).  In July 2016, Plaintiff received a notice from the TLC informing Plaintiff of seven steps he needed to take by August 24, 2016, in order to renew his license.  (*Id.*). Plaintiff completed these seven tasks by August 24, 2016.  (Tr. 24:1-25).  By letter dated August 30, 2016, the TLC notified Plaintiff that his renewal application could not be processed until he submitted a valid medical form and completed a training course for FHV drivers.  (Pl. Ex. 2; Tr. 26:17-21).  This latter requirement was not among the seven tasks listed in the original renewal

4

notice; years later, in the course of pretrial proceedings, the TLC ultimately
conceded that the requirement did not in fact apply to Plaintiff.  (Pl. Ex. 1;
Tr. 27:9-12; Pl. FFCL 5; Stipulation 2).  Between August 2016 and March 2017,
Plaintiff repeatedly contacted the TLC to attempt to resolve the issue and to
obtain a temporary sticker that would allow him to continue working as an
FHV driver in the interim.  (Tr. 26:22-27:20).

On March 24, 2017, the TLC notified Plaintiff that his license renewal
had been approved and that he could obtain a temporary extension sticker
from the TLC office for use until his new license arrived in the mail.  (Pl. Ex. 3).
At the time of his notification, Plaintiff had not completed the FHV training
course that the TLC's August 30, 2016 letter had said was required; indeed,
Plaintiff was in the middle of attending the course when he received the
notification.  (Tr. 29:16-18).  Defendant acknowledges that "the driver
education requirements set forth in Title 55, Sections 55-04(j) and (j)(2) of the
Rules of the City of New York ('RCNY') had been misapplied to Plaintiff thereby
preventing renewal of Plaintiff's For-Hire Vehicle license from August 25, 2016
through March 24, 2017."  (Stipulation 2).  As a result of this error, Plaintiff
was unable to work as an FHV driver from August 25, 2016, to April 2017.  (Tr.
30:24-31:8, 56:5-19; Pl. Ex. 2-3).

## C.    Plaintiff's Personal and Financial Circumstances

In 2016, Plaintiff earned $44,334 working for Allied.  (Def. Ex. K,
JEANTY604).  Plaintiff additionally earned $15,544 gross income, resulting in
$5,053 net profit, working part time as an FHV driver from April through

August of 2016.  (Def. Ex. C, JEANTY026).  In 2017, Plaintiff earned $15,974

from Allied.  (Def. Ex. L, JEANTY611).  The same year, he earned $40,836 gross

income, resulting in $14,636 net profit, driving an FHV part time from April to

July and full time from July through December.  (Def. Ex. D, JEANTY032;

Tr. 52:17-53:10, 54:20-55:3).  In 2018, Plaintiff worked full time as an FHV

driver and earned $102,229 gross income, resulting in $38,140 net profit.

(Def. Ex. E, JEANTY042; Tr. 55:21-56:4).  During the years Plaintiff worked for

Allied, when he was seasonally laid off from December through March, he

received unemployment compensation and food stamps.  (Tr. 50:18-52:10,

58:6-60:7).

At trial, Plaintiff presented evidence that the erroneous withholding of his

FHV license had far-reaching consequences.  One such consequence was

arguably positive:  When Plaintiff was working, he received assistance both

from his sister and from hired providers in taking care of his sons.  (Tr. 65:2-

67:1).  From December 2016 to April 2017, when Plaintiff neither worked for

Allied nor drove an FHV due to his lack of license, he assumed all childcare

responsibilities.  (*Id.* at 67:2-9).

Other consequences were decidedly less beneficial.  For that portion of

each year when Plaintiff was not employed by Allied, he lost health insurance

coverage for himself and his three sons.  (Tr. 44:10-12).  For the period

spanning December 2016 to April 2017, Plaintiff hoped to maintain insurance

coverage through the Consolidated Omnibus Budget Reconciliation Act, or

"COBRA."  (*Id.* at 44:12-15, 77:10-17).  Due to lack of income from either Allied

6

or FHV work, Plaintiff was unable to do so and his coverage lapsed.  (*Id.* at 44:15).  He and his sons were thus reliant on going to the emergency room for necessary care.  (*Id.* at 44:20-21).

From April 2016 to August 2016, Plaintiff leased a vehicle for use as an FHV.  (Tr. 73:12-14).  From April 2017 to July 2017, Plaintiff used his personal vehicle, a Dodge Durango, as an FHV.  (*Id.* at 72:11-12, 73:15-17).  Plaintiff's personal vehicle was repossessed in July 2017 due to his default on financing payments.  (*Id.* at 37:18-38:19; Pl. Ex. 7).  Thereafter, Plaintiff rented a Mercedes-Benz seven-passenger van for use as an FHV through Via, a ridesharing provider.  (Tr. 38:20-17; Pl. Ex. 8).  From July 2017 to December 2018, Plaintiff paid a total of $19,790.23 in vehicle rental fees to Via.  (Tr. 40:9-15; Pl. Ex. 9).

From 2012 to 2017, Plaintiff and his sons lived in East Meadow, New York, in rental properties shared with Plaintiff's sister and her family. (Tr. 33:15-25).  Due to Plaintiff's lack of income from December 2016 to April 2017, Plaintiff was unable to pay his portion of the rent and household expenses.  (*Id.* at 34:8-11).  As a result, Plaintiff, his sister, and their families were subject to eviction proceedings in the fall of 2017 and ultimately ordered to leave the East Meadow property in early 2018.  (*Id.* at 34:17-35:12, 77:22-25; Pl. Ex. 10).  Plaintiff and his sons moved to an apartment in Ozone Park, Queens.  (*Id.* at 35:13-15).  Plaintiff found Ozone Park to be a less salubrious environment than East Meadow, due to safety concerns, ambient noise, and rodents and bugs inside the apartment.  (*Id.* at 35:16-36:14).  Plaintiff's sons

continued to attend school in the East Meadow School District, but even this continuity came with a price, namely, an 80-minute bus ride each way. (*Id.* at 36:15-21).

## CONCLUSIONS OF LAW

**A.     Plaintiff Is Entitled to an Award of Compensatory Damages for Lost Wages and a Portion of Rental Vehicle Expenses**

42 U.S.C. § 1983 "creates a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution." *Memphis Cmty. Sch. Dist.* v. *Stachura*, 477 U.S. 299, 304 (1986) (internal quotation marks omitted). "Accordingly, when § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts." *Id.* (citing *Smith* v. *Wade*, 461 U.S. 30, 34 (1983); *Carey* v. *Piphus*, 435 U.S. 247, 257-58 (1978)); *see also Amato* v. *City of Saratoga Springs*, 170 F.3d 311, 317 (2d Cir. 1999) ("[T]he main purpose of a § 1983 claim is to compensate individuals for injuries caused by the deprivation of constitutional rights[.]"). *See generally Francis* v. *City of New York*, No. 15 Civ. 7997 (VSB) (KHP), 2019 WL 8918743, at *6 (S.D.N.Y. Nov. 12, 2019), *report and recommendation adopted*, 2020 WL 2792995 (S.D.N.Y. May 29, 2020). An award of damages sustained by a plaintiff because of tortious conduct is guided by the well-settled principle that "a tortfeasor should be required to put his victim in the same economic position that he would have occupied had he not been injured." *McCrann* v. *U.S. Lines, Inc.*, 803 F.2d 771, 773 (2d Cir.

1986).  To that end, "a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages. He need not prove the amount of loss with mathematical precision; but the jury is not allowed to base its award on speculation or guesswork." *Sir Speedy, Inc.* v. *L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992).

Plaintiff seeks $35,000 in compensatory damages for lost wages and $19,000 in compensatory damages for vehicle rental costs paid to Via after Plaintiff's personal vehicle was repossessed in July 2017.  (*See* Pl. FFCL 22). For the reasons set forth below, the Court awards Plaintiff $15,745.13 for lost wages and $4,935.97 for rental vehicle costs.

### 1.    Lost Wages

Plaintiff seeks $35,000 in compensatory damages as a result of lost wages for the period of August 25, 2016, to March 27, 2017, when he was without an FHV license due to the TLC's error.  (*See* Pl. FFCL 14-15).  He calculates this figure based on FHV income he earned during the corresponding time periods in 2018, namely, January 1, 2018, to March 25, 2018, and August 27, 2018, to December 30, 2018.  (*See id.* at 14).  Because "Defendant's wrongful acts have ... created uncertainty as to how much Mr. Jeanty would have made during [the period when he was without an FHV license]," Plaintiff believes that his income in 2018, "the first full year in which Mr. Jeanty had his FHV license, ... serves as the fairest metric to calculate his damages for lost wages." (*Id.* at 15).  Defendant, in contrast, both disputes the representativeness of Plaintiff's 2018 income and argues that Plaintiff's award

for lost wages should be reduced because Plaintiff failed to take reasonable steps to mitigate his lost wages. (*See* Def. FFCL 6-8, 9-11). Basing its calculations on Plaintiff's 2016 and 2017 average monthly earnings as an FHV driver, Defendant calculates that Plaintiff is entitled to no more than $8,107 as compensation for lost wages. (*See id.* at 8). Defendant further asserts that because Plaintiff admittedly "made no efforts to mitigate his damages, any award must be appropriately reduced to reflect this failure." (*Id.* at 11).

The Court arrives at a position between those of the parties. *First,* the Court determines that Plaintiff's pre-tax net profit from driving an FHV, rather than his gross income, is the proper reference point for determining his lost wages. Had Plaintiff been able to work as an FHV driver during the seven-month period from August 25, 2016, to March 27, 2017, he would have earned additional income, but he also would have incurred additional expenses. In each of 2016, 2017, and 2018, after deduction of FHV-related expenses, Plaintiff's net profit was approximately one-third of his gross earnings. (*See* Def. Ex. C, JEANTY026; Def. Ex. D, JEANTY032; Def. Ex. E, JEANTY042). Thus, awarding Plaintiff his lost gross income, as he requests, rather than his lost net profit, would result in a windfall.

*Second*, the Court analyzes separately the three months from August 25, 2016, through the end of November 2016, when Plaintiff primarily worked for Allied, and the four months from December 2016 to the end of March 2017, when Plaintiff's income would have accrued solely from FHV driving. For the first three months, the Court deems it appropriate to look to the months

10

immediately prior, *i.e.*, April to August 2016.  During this five-month period, as stated above, Plaintiff earned $5,053 net profit.  (*See* Def. Ex. C, JEANTY026; Tr. 54:5-9).  Reducing that figure proportionately, the Court calculates that Plaintiff lost approximately $3,031.80 in net profits during the three months he would have worked both at Allied and as an FHV driver.  To calculate Plaintiff's lost wages for the four months of December 2016 through March 2017, the Court looks to Plaintiff's average monthly profit when Plaintiff worked full-time as an FHV driver in 2018.  Plaintiff's net profit in 2018 was $38,140.  (*See* Def. Ex. E, JEANTY042).  Reduced proportionately to a four-month period, Plaintiff's approximate lost wages would have been $12,713.33.  In total, the Court calculates that Plaintiff's approximate lost wages from August 25, 2016, to March 27, 2017, were $15,745.13.

*Third*, the Court considers Defendant's argument regarding Plaintiff's failure to mitigate his damages by searching for alternative employment during the period he was without his FHV license.

> In New York, a party that "has been injured either in his person or his property by the wrongful act or default of another is under an obligatory duty to make a reasonable effort to minimize the damages liable to result from such injury," and a failure to make such an effort will bar that party "from recovering for those additional damages which result from such failure."

*City of New York* v. *Fedex Ground Package Sys., Inc.*, 314 F.R.D. 348, 357 (S.D.N.Y. 2016) (quoting *Ridgeview Partners, LLC* v. *Entwistle*, 354 F. Supp. 2d 395, 402 (S.D.N.Y. 2005)).  "While it is the plaintiff's duty to mitigate, it is the defendant who has the evidentiary burden of demonstrating at trial that a

11

plaintiff has failed to satisfy this duty." *Dailey* v. *Societe General*, 108 F.3d 451, 456 (2d Cir. 1998). "This may be done by establishing [i] that suitable work existed, and [ii] that the employee did not make reasonable efforts to obtain it." *Id.*

At trial, Plaintiff acknowledged that he did not search for alternate employment to replace FHV driving during the period of August 25, 2016, to April 2017. (*See* Tr. 30:6-9, 60:8-62:17). Plaintiff explained that this was because there was no realistic prospect of him obtaining alternate employment that he considered a suitable substitute for FHV driving given the constraints he faced, including his need for scheduling flexibility to accommodate his childcare responsibilities and the short duration of the work sought, as limited by his off-months from Allied. (*See id.* at 61:3-63:5). Plaintiff testified that he also had difficulty in the past obtaining work due to his criminal history. (*See id.* at 30:12-21). As a result of these factors, and expecting that the TLC's error would soon be corrected, Plaintiff focused his efforts on obtaining his renewed FHV license, or at least a temporary extension sticker, as soon as possible. (*See id.* at 26:22-27:24).

Given these circumstances, the Court agrees with Plaintiff that Defendant has not carried its burden to prove that Plaintiff failed to make a reasonable effort to mitigate his damages. Defendant did not establish either that suitable alternate work existed or that Plaintiff's focus on renewing his FHV license as soon as possible by following up regularly with the TLC was an unreasonable course of conduct. *Cf. Dailey*, 108 F.3d at 456 (explaining that,

in the Title VII context, a "plaintiff does not have to endure extreme hardship to meet her mitigation obligations.  Rather, the obligation is one of reasonable diligence." (internal quotation marks omitted)).  Accordingly, the Court declines to reduce Plaintiff's compensatory damages for failure to mitigate, and awards Plaintiff $15,745.13 in lost wages.

### 2.    Vehicle Payments

Plaintiff also seeks $19,000 in damages to compensate for the cost of leasing a vehicle for use as an FHV after his personal vehicle was repossessed in July 2017.  (*See* Pl. FFCL 22).  Defendant responds that the appropriate amount of damages is not the "full cost associated with leasing a vehicle," but instead "the difference between the cost of maintaining his personal vehicle and the cost of leasing a replacement vehicle."  (Def. FFCL 9).

"Tort defendants, including those sued under § 1983, are responsible for the natural consequences of their actions." *Tsesarskaya* v. *City of New York*, 843 F. Supp. 2d 446, 460 (S.D.N.Y. 2012) (internal quotation marks omitted) (quoting *Kerman* v. *City of New York*, 374 F.3d 93, 126 (2d Cir. 2004)).  "Thus, an actor may be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." *Id.*  Here, although Plaintiff's personal vehicle was repossessed several months after Plaintiff's FHV license was renewed on March 24, 2017, Plaintiff claims this was the result of being "deprived of a significant source of income from August 25, 2016 to March 24, 2017," and consequently falling behind on his financing payments.  (Pl. FFCL 9).  Defendant does not dispute that the repossession of

Plaintiff's personal vehicle due to his inability to make financing payments was a reasonably foreseeable consequence of the improper withholding of his FHV license. (*See* Def. FFCL 8-9). Nor does Defendant dispute the reasonableness of Plaintiff requesting reimbursement for 17 months of rental fees. (*See id.*). Instead, Defendant argues that the compensatory damages award should be reduced in recognition both of what Plaintiff saved on personal vehicle expenses during that same time period and of Plaintiff's choice to lease a more expensive vehicle. (*See id.*).

To begin, the Court is skeptical of the degree to which the repossession of Plaintiff's vehicle is attributable to his lost income for the seven-month period when the TLC improperly withheld his FHV license. Of course, the loss of approximately $15,745 in wages during that period, as calculated above, is significant. But the notice from Plaintiff's dealer-lender states that, as of June 25, 2017, he was already past due payment in the amount of $27,174.32. (*See* Pl. Ex. 7). Dividing by his monthly payment rate of $873.78 (*see* Pl. Ex. 6), this past due figure suggests that Plaintiff was overdue on 31 months of payments. In other words, Plaintiff was in arrears for some time prior to the events at issue in this case, and perhaps since as far back as November 2014. Thus, while it may be the case that the withholding of his FHV license was the but-for cause of the repossession of his vehicle, that can hardly be considered the primary cause.

With that in mind, the Court agrees with Defendant that Plaintiff's compensatory damages for rental fees should be reduced by what he would

have expended had he continued to possess his personal vehicle, as this net amount, rather than the gross rental costs, constitutes Plaintiff's true loss. Plaintiff owed $873.78 monthly to maintain possession of his personal vehicle (*see* Pl. Ex. 6, 7), payments which would have totaled $14,854.26 over the 17 months he instead rented a vehicle from Via.  Subtracting this figure from the $19,790.23 total rental fees Plaintiff paid to Via (*see* Tr. 40:9-14; Pl. Ex. 9), Plaintiff's damages from renting a vehicle rather than maintaining his own vehicle were $4,935.97.  The Court declines to reduce this figure further based on Plaintiff's choice of vehicle, as Defendant requests, because the Court considers it reasonable for Plaintiff to have selected a vehicle with the same passenger capacity as his personal vehicle.  (*See* Tr. 39:5-8).

Combining these figures, the Court awards Plaintiff a total of $20,681.10 in compensatory damages for lost wages and rental vehicle costs.

## B.    Plaintiff Is Entitled to an Award of Emotional Damages

Separately, Plaintiff seeks $50,000 in damages for emotional distress resulting from Defendant's unconstitutional conduct.  (*See* Pl. FFCL 22). Plaintiff argues that he is entitled to this award because he "suffered from emotional distress, fear, sleeplessness, anxiety, humiliation, mental anguish, and suffering," and was "forced to move from a safe and comfortable neighborhood in Long Island to Ozone Park, a neighborhood that was not as safe for him and his three sons."  (*Id.* at 19-20).  In contrast, Defendant asserts that "Plaintiff is not entitled to recover any emotional distress damages based on his subjective and uncorroborated testimony," and because his distress is

not reasonably attributable to Defendant.  (Def. FFCL 11-14).  The Court agrees with Plaintiff that he is entitled to damages for emotional distress, but only in an amount at the low end of the range for "garden variety" emotional distress.

"It is well-established that courts may award damages for emotional suffering in Section 1983 cases."  *Patrolmen's Benevolent Ass'n of City of N.Y.* v. *City of New York*, 310 F.3d 43, 55 (2d Cir. 2002) (citing *Miner* v. *City of Glens Falls*, 999 F.2d 655, 662 (2d Cir. 1993)).  However, an award of emotional distress damages is not automatic; a plaintiff must establish by competent evidence that he suffered an actual injury caused by the deprivation of his rights.  *See, e.g.*, *Carey* v. *Piphus*, 435 U.S. at 263-64 ("Petitioners' argument is the more limited one that such injury cannot be presumed to occur, and that plaintiffs at least should be put to their proof on the issue, as plaintiffs are in most tort actions.  We agree with petitioners in this respect.").  "A plaintiff's subjective testimony, standing alone, is generally insufficient to sustain an award of emotional distress damages."  *Patrolmen's Benevolent Ass'n*, 310 F.3d at 55; *see also Annis* v. *County of Westchester*, 136 F.3d 239, 249 (2d Cir. 1998) ("Finally, we find that the only evidence of [plaintiff's] emotional distress — her own testimony — is insufficient to warrant an award of compensatory damages for that injury."); *Kim* v. *Dial Serv. Int'l, Inc.*, No. 96 Civ. 3327 (DLC), 1997 WL 458783, at *13-14 (S.D.N.Y. Aug. 11, 1997) (reducing $300,000 emotional distress award to $25,000 "given the sparse evidence introduced at trial regarding the plaintiff's mental anguish").  However, expert testimony is not required; rather, a plaintiff's testimony as to the emotional

16

harm he suffered, plus corroboration by testimony of witnesses and/or the objective circumstances of the violation, generally suffices.  *See Zakre* v. *Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 568 (S.D.N.Y. 2008) (citing *N.Y.C. Transit Auth.* v. *State Div. of Human Rights*, 78 N.Y.2d 207, 216 (1991)).

   In determining whether and to what extent Plaintiff is entitled to emotional distress damages, the Court considers, among other factors, amounts awarded in similar cases.  Plaintiff contends that the "suffering [he] experienced fits squarely within the 'garden variety' of emotional distress."  (Pl. FFCL 21).  In the Second Circuit, "garden variety" emotional distress claims "typically lack extraordinary circumstances and are not supported by any medical corroboration," *MacMillan* v. *Millennium Broadway Hotel*, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012), and "generally merit $30,000 to $125,000 awards," *id.* at 561; *see also Walz* v. *Town of Smithtown*, 46 F.3d 162, 170 (2d Cir. 1995) (affirming damages ranging from $20,400 to $40,800); *Olsen* v. *County of Nassau*, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009) ("Garden variety emotional distress claims generally merit $30,000 to $125,000 awards." (internal quotation marks omitted)).

   Plaintiff relies on his own subjective testimony to establish his emotional distress (*see* Tr. 40:16-22; 43:17-20), corroborated in broad terms by his sister, who inferred his emotional state from observed changes in his demeanor (*see id.* at 86:23-87:3, 89:20-90:4, 93:6-14).  The Court also considers the objective circumstances that Plaintiff faced after his FHV license was improperly

17

withheld, including eventually being evicted from his home in East Meadow and moving to Ozone Park, a neighborhood he found objectionable. The evidence before the Court indicates that Plaintiff's financial difficulties and uneasy relationship with his family preexisted, and are not wholly attributable to, the loss of his FHV license for seven months and the resulting loss of income. (*See id.* at 76:11-77:19, 85:12-88:4, 90:24-91:7; Pl. Ex. 7). Nevertheless, the loss of income plainly exacerbated Plaintiff's economic woes and anxiety about being able to provide adequately for his family. Therefore, the Court concludes that Plaintiff is entitled to low-end "garden variety" emotional distress damages in the amount of $35,000.

## C.    Plaintiff Is Entitled to Prejudgment Interest

Finally, Plaintiff seeks prejudgment interest on his damages award at the average Treasury bill ("T-bill") rate over the time for which interest is awarded. (*See* Pl. FFCL 21-22). Defendant does not contest the appropriateness either of an award of prejudgment interest or the rate of interest. (*See generally* Def. FFCL).

Section 1983 contains no provision regarding prejudgment interest, and thus the Court may award prejudgment interest in accord with its equitable discretion. *See Rao* v. *N.Y.C. Health and Hosps. Corp.*, 882 F. Supp. 321, 325 (S.D.N.Y. 1995); *see also Gierlinger* v. *Gleason*, 160 F.3d 858, 873 (2d Cir. 1998). The factors to be applied in making a discretionary award of prejudgment interest include: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the

18

relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *Wickham Contracting Co., Inc.* v. *Local Union No. 3, Int'l Bhd. of Elec. Workers*, 955 F.2d 831, 834 (2d Cir.) (citations omitted), *cert. denied*, 506 U.S. 946 (1992).

In light of these factors, the Court concludes that prejudgment interest on Plaintiff's economic compensatory damages, *i.e.*, his lost wages and vehicle rental payments, is warranted. "The purpose of the remedial scheme provided by 42 U.S.C. § 1983 is to fully compensate individuals for harm suffered as a result of a constitutional violation," and "[p]rejudgment interest is usually a necessary component of any award intended to make a plaintiff whole[.]" *Rao*, 882 F. Supp. at 326. Prejudgment interest is appropriate for this portion of Plaintiff's damages because Plaintiff was deprived of FHV profits, and for self-employed persons, lost profits are akin to lost wages. *See Tretola* v. *County of Nassau*, No. 08 Civ. 3225 (DRH) (WDW), 2014 WL 2866095, at *2 (E.D.N.Y. June 24, 2014); *Turley* v. *N.Y. Police Dep't*, 988 F. Supp. 675, 682 (S.D.N.Y 1997), *rev'd on other grounds*, 167 F.3d 757 (2d Cir. 1999); *see also Gierlinger*, 160 F.3d at 873 ("To the extent, however, that the damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion *not* to include pre-judgment interest." (internal quotation marks omitted)).

Under federal law, the applicable interest rate for backpay is the average rate of return on one-year T-bills for the relevant time period. *See Antoine* v.

*Brooklyn Maids 26, Inc.*,  No. 19 Civ. 5676 (KAM), 2020 WL 5752186, at *14 (E.D.N.Y. Sept. 26, 2020) (citing *Kuper* v. *Empire Blue Cross & Blue Shield*, No. 99 Civ. 1190 (JSG) (MHD), 2003 WL 23350111, at *3 (S.D.N.Y. Dec. 18, 2003)); *see also Rao*, 882 F. Supp. at 327-28.  The award of prejudgment interest is calculated from the time the claim arises through the date of entry of judgment.  *See Antoine*, 2020 WL 5752186, at *14 (citing *Joseph* v. *HDMJ Rest., Inc.*, 970 F. Supp. 2d, 131, 151 (E.D.N.Y. 2013)).  Accordingly, the following methodology applies:

> First, the backpay award should be divided pro rata over the appropriate time period.  Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 will be applied.  Third and finally, in order to guarantee complete compensation to the plaintiff, the interest will be compounded annually.

*Joseph*, 970 F. Supp. 2d at 151 (citations and alterations omitted).

Based on the foregoing, Plaintiff is granted pre-judgment interest on his economic compensatory damages of $20,681.10 at the average annual United States T-bill rate of interest from August 25, 2016, when his claim against Defendant accrued, through the date of entry of judgment.  This rate average calculates to 1.39% and shall be compounded annually.

## CONCLUSION

In summary, the Court awards to Plaintiff as follows:

1. Economic compensatory damages in the amount of $20,681.10.

2. Emotional distress compensatory damages in the amount of $35,000.00.

3.      Prejudgment interest on his economic compensatory damages of
$20,681.10 at a rate of 1.39%, compounded annually, for the
period from August 25, 2016, through the date of judgment.

The parties are directed meet and confer regarding the matter of
attorneys' fees and to file with the Court, on or before **February 26, 2021**, a
joint stipulation as to attorneys' fees or a letter proposing a schedule for a
motion for attorneys' fees.

SO ORDERED.

Dated:      January 27, 2021
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

21